**Nancy J. LaPOINTE, Patricia A. Daley, Mary E. Rozman, and Frances A. Poulin, Plaintiffs,**

v.

**WINDSOR LOCKS BOARD OF EDUCATION, Defendants.**

No. CIVA3:00CV1211(CFD).

United States District Court,
D. Connecticut.

March 30, 2001.

Kathleen Eldergill, Beck & Eldergill, Manchester, CT, for Plaintiffs.

Loren Lettick, Wallingford, CT, for Defendants.

### RULING

DRONEY, District Judge.

This action was brought under 42 U.S.C. § 1983 by four Windsor Locks residents against the Windsor Locks Board of Education (the "Board"). The plaintiffs alleged that the Board's policy regulating public participation at its meetings violated their rights under the First and Fourteenth Amendments. They requested declaratory relief, injunctive relief, and attorney's fees and costs pursuant to 42 U.S.C. § 1988. However, the Board revised the policy soon after the plaintiffs' complaint was filed, and the parties later notified the Court that an adjudication on the merits was no longer necessary in light of the change in policy. This case was then closed without prejudice to the parties litigating the issues relating to an award of attorney's fees.

Pending is the plaintiffs' Petition for Attorney's Fees [Doc. # 9]. For the follow-ing reasons, the petition is granted, in part.

### Findings of Fact

At its March 23, 2000, meeting, the Board approved a new policy regarding public participation at its meetings. The policy provided, in relevant part,

> During Public Comment, the Chairperson shall recognize speakers, request proper identification and maintain proper order. The Board shall hear only concerns, views, and opinions that are within the jurisdiction of the Board.

> The appropriateness of the subject being presented, the suitability of the time for such presentation, the number of speakers, and the time to be allowed for public comment will be determined by the Chairperson. However, the Board as a whole shall have the final decision in determining such rulings.

> The following statement shall be part of each Board Agenda:

> *The Board welcomes Public Participation and asks that speakers please limit their comments to 3 minutes. Speakers may offer objective comments of school operations and programs that concern them. The Board will not permit any expression of personal compliant (sic) or defamatory comments about Board of Education personnel and students, nor against any person connected with the Windsor Locks Public School System.* (hereinafter referred to as "the public participation statement")

(Aff. of Nancy J. LaPointe Exh. A). On May 15, 2000, the plaintiffs filed a notice of intent to sue with the town clerk under Conn. Gen.Stat. § 7–101a and § 7–465. The notice alleged that the Board's new policy-in particular, the public participation statement portion above-violated the plaintiffs' rights under the First and Four-

teenth Amendments. Ann G. Levy, the Board's chairperson, became aware of the notice the next day. (Levy Aff. at ¶ 4.)

On May 18, 2000, in response to the notice, the Board convened a special meeting during which it discussed the policy in executive session with its attorney, Loren Lettick. On May 24, 2000, Attorney Lettick faxed the plaintiffs' attorney, Kathleen Eldergill, a revised draft of the policy (the "first revision"). The first revision stated in part,

> The purpose of Board of Education meetings is for the Board to conduct business of the Windsor Locks Public Schools. In order to insure that sufficient time is available at each meeting for the Board to conduct its business, it may be necessary to place reasonable individual and overall time limits on public comments. During public comment, the Chairperson shall recognize speakers, request proper identification and maintain proper order. The Board shall hear only concerns, views, and opinions that are within the jurisdiction of the Board. Public comment at special meetings shall be limited to the agenda topic(s) for such meeting. The appropriateness of the subject being presented, the suitability of the time for such presentation, the number of speakers, and the time to be allowed for public comment will be determined by the Chairperson. However, the Board as a whole shall have the final authority to make such rulings.

The following statement shall be part of each Board Agenda:

> The Board welcomes Public Participation and asks that speakers please limit their comments to 3 minutes. Speakers may offer objective comments of school operations and programs that concern them. The Board will not permit any complaints of a defamatory nature about Board of Education personnel and students, or against any person connected with the Windsor Locks Public School System, or others.

(Eldergill Aff. Exh. B). However, Attorney Eldergill informed Attorney Lettick that the first revision did not adequately respond to the plaintiffs' concerns.

The policy was listed on the agenda for the Board's regularly scheduled meeting of May 25, 2000.[1] During that meeting, the superintendent of schools indicated that the policy had been clarified after working with the Board's attorney, and the Board briefly reviewed the first revision.[2] The policy was scheduled for a second reading[3] at the Board's regularly scheduled meeting of June 8, 2000, but the matter was "tabled" and the Board did not address it at that time.

Some time between June 8, 2000, and June 19, 2000, Ms. Levy informed Attorney Lettick that "the Board had decided to take a more conservative approach" and requested that he redraft the policy. On June 19, 2000, Attorney Lettick faxed a

---

1. According to the affidavit of Chairperson Levy, the Board holds regular meetings twice a month during most of the year. In July and August, however, the Board holds only one meeting per month. It appears that the Board may call special meetings pertaining to particular topics when it deems them necessary.

2. The first revision reviewed at the Board meeting contained only minor grammatical

changes from the draft that Attorney Lettick sent to Attorney Eldergill the previous day.

3. As Levy explained in a hearing before this Court, it is the Board's policy to review policy revisions three times-at a first, second, and third reading. The Board then votes after the third reading. It appears that the policy was never scheduled for a first "reading"-only a review.

new draft of the policy (the "second revision") to Ms. Levy.[4] The second revision provided in part,

> The purpose of the Board of Education meetings is for the Board to conduct the business of the Windsor Locks Public Schools. In order to insure that sufficient time is available at each meeting for the Board to conduct its business, it may be necessary to place reasonable individual and overall time limits on public comments. During public comment, the Chairperson shall recognize speakers, request proper identification and maintain proper order. The Board shall hear only concerns, views and opinions on topics that are within the jurisdiction of the Board. Public comment at special meetings shall be limited to the agenda topic(s) for such meeting. The appropriateness of the subject being presented, the suitability of the time for such presentation, the number of speakers, and the time to be allowed for public comment will be determined by the Chairperson. However, the Board as a whole shall have the final authority to make such rulings.

(Supp. Memo. Opp. Pet. Attorney's Fees, Exh. 8). It did not contain the public participation statement.

The Board was scheduled to review the policy at its June 22, 2000 meeting, but it again was "tabled." Ms. Levy explains that she chose not to discuss the policy at that time because the Board's secretary had not yet typed the second revision in a format suitable for distribution at the meeting, although the plaintiffs question this explanation. On June 29, 2000, the plaintiff filed the instant action in United States District Court. Ms. Levy received a copy of the lawsuit the next day, and on

July 6, 2000, she signed a Waiver of Service of Summons under Fed.R.Civ.P. 4(d).

On July 7 or 8, 2000, Attorney Lettick transmitted another draft of the policy (the "third revision"), which was the same as to the second revision, except for one change. In a letter to Ms. Levy which was attached to the third revision, Attorney Lettick explained,

> One of the claims brought by Ms. La-Pointe in her federal lawsuit concerning the ... Policy relates to the alleged vagueness of the "appropriateness of the subject matter being presented." ... I again redrafted the policy to provide a "belt and suspenders" approach to refute Ms. LaPointe's charge by adding a parenthetical clause which sets an objective standard for determining the appropriateness of the subject matter presented [during the public comment period at the Board's meetings].

(Supp. Memo. Opp. Pet. Attorney's Fees, Exh. 10). The policy was scheduled for a third reading at the Board's July 27, 2000 meeting. At that meeting, four versions of the policy were made available to the public, and the Board adopted the third revision, which removed all the provisions to which the plaintiffs objected, and added the new "objective standard" referred to in Attorney Lettick's letter. The final policy stated in part,

> The purpose of the Board of Education meetings is for the Board to conduct the business of the Windsor Locks Public Schools. In order to insure that sufficient time is available at each meeting for the Board to conduct its business, it may be necessary to place reasonable individual and overall time limits on public comments. During public comment,

---

4. The plaintiffs argue that there were no Board meetings between June 8 and 19 (except three special meetings during which the policy was not discussed), and therefore that the Board could have made no decision about changing its approach during that time.

the Chairperson shall recognize speakers, request proper identification and maintain proper order. The Board shall hear only concerns, views and opinions on topics that are within the jurisdiction of the Board. Public comment at special meetings shall be limited to the agenda topic(s) for such meeting. The appropriateness of the subject being presented *(i.e. the relationship of the topic(s) to matters that are within the jurisdiction of the Board of Education at regular meetings, or to matters on the agenda at special meetings)*, the suitability of the time for such presentation, the number of speakers, and the time to be allowed for public comment will be determined by the Chairperson. However, the Board as a whole shall have the final authority to make such rulings. (emphasis added)

(LaPointe Aff. Exh. N, No. 1). The italicized portion of the policy above is the "objective standard" added by Attorney Lettick. Like the second revision, this final version of the policy did not contain the public participation statement.

Based on these events, the Court finds that the filing of the lawsuit was a "substantial factor" that contributed to the final language of the policy, in particular the "objective standard" added by Attorney Lettick in the third revision, and also caused the Board to accelerate and complete the adoption process.

### Discussion

The plaintiffs argue that their legal action was a catalyst for the change in the policy and maintain that they are prevailing parties entitled to an award of attorney's fees and costs. Specifically, the plaintiffs request fees of $3,932.50, and costs in the amount of $150.00, with leave to supplement their request based on additional time spent litigating the fees issue.

While the Board concedes that it is unlikely that it would have revised the policy if the plaintiffs had not filed their notice of intent to sue, it argues that the filing of the notice of intent to sue is not enough to "trigger" its obligation to pay attorney's fees to a prevailing party under 42 U.S.C. § 1983. In addition, it contends that the filing of a notice of intent to sue does not constitute the filing of a lawsuit, and thus that notice cannot be considered a catalyst that would entitle the plaintiffs to an award of attorney's fees and costs. It also contends that the filing of the lawsuit did not cause the changes in the policy.

### A. Prevailing party

■ Courts may award attorney's fees to prevailing parties in actions brought under section 1983. *See* 42 U.S.C. § 1988; *see also Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (holding that the time "reasonably expended on the litigation" is compensable under section 1988). The key to determining whether a plaintiff is a prevailing party "is whether the litigation resulted in an alteration of the legal relationship between the parties." *Association of Retarded Citizens of Connecticut, Inc. v. Thorne*, 68 F.3d 547, 552 (2d Cir.1995) (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (endorsing the *Hensley* test)). Under the Supreme Court's "generous formulation," plaintiffs are prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *see also Texas State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. 1486. This success need not be evidenced by a final judgment, as long as the defendant "under pressure of the lawsuit, alters his conduct (or threatened conduct) towards the plaintiff that was the

basis for the suit, the plaintiff will have prevailed." *Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) (referring to declaratory judgment actions).

■ However, "the prevailing party must show a causal connection between the relief obtained and the litigation in which the fees are sought." *Koster v. Perales,* 903 F.2d 131, 135 (2d Cir.1990) (quoting *Gerena–Valentin v. Koch,* 739 F.2d 755, 758 (2d Cir.1984)). It is not enough that the defendant changes its conduct under the pressure of the lawsuit; "the lawsuit must be 'a catalytic, necessary, or substantial factor in attaining the relief.'" *Marbley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995) (quoting *Koster,* 903 F.2d at 135 (quotation omitted)); *see also Morris v. Lindau,* 196 F.3d 102, 116 (2d Cir. 1999). The Second Circuit further explained this standard as follows:

> A government's change of policy or position may coincide with the interests or desires of persons who seek to promote change by litigation, without evidencing a causal connection. Certainly, governments may change a policy without paying a toll or tribute to persons who advocated that policy change in court. However, a plaintiff whose lawsuit has been the catalyst in bringing about a goal sought in litigation, by threat of victory (and not by dint of nuisance and threat of expense), has prevailed for purposes of an attorney's fee claim, even though the result has not been reduced to a judgment, consent decree, or settlement.

*Marbley,* 57 F.3d at 233. The sequence of events may be evidence of causation for the purposes of determining whether a party has prevailed. *See, e.g., Koppel v. Wien,* 743 F.2d 129, 135 (2d Cir.1984). However, the Supreme Court has suggested that a plaintiff must actually file a complaint in court to qualify for an award of attorney's fees under section 1988. *See North Carolina Dep't of Transp. v. Crest Street Community Council,* 479 U.S. 6, 14, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986) ("It is entirely reasonable to limit the award of attorney's fees to those parties who, in order to obtain relief, found it necessary to file a complaint in court.").

**B. Are the Plaintiffs Prevailing Parties?**

■ Here, the parties agree that the change in the public participation policy is a success that would ordinarily entitle the plaintiffs to an award of attorney's fees and costs under 42 U.S.C. § 1988. However, they dispute whether the plaintiffs' filing of the notice of intent to sue can be considered the catalyst that caused the change and also maintain that the filing of the suit had little or no effect on the final resolution. The plaintiffs contend that their lawsuit prompted the change, as the Board did not redraft and adopt the final policy until July 27, 2000, after the lawsuit was filed. Thus, they conclude that they are prevailing parties under § 1988 on both bases.

The defendant does not dispute that the notice of intent to sue was the catalyst for the Board's revision of the public participation policy, but contends that filing a notice of intent to sue should not be considered the filing of a lawsuit, as it "serves no greater purpose than would have been served by a simple demand letter or telephone call." The Board further argues that the changes made in the first revision would have been legally sufficient under the First Amendment, and thus that the plaintiffs' purpose had been achieved by May 24, 2000, well before the date when they actually filed their lawsuit. Essentially, the Board contends that the plaintiffs "merely caught hold of a train on its way out of the station and are seeking to

ride it to an award of substantial attorney's fees." *Bush v. Bays,* 463 F.Supp. 59, 66 (E.D.Va.1978).

It is clear from the chain of events that the notice of intent to sue was a factor that prompted the Board's change in policy. The Board admits that it is unlikely that it would have changed the policy if it had not received the notice of intent to sue letter, and the chronology of events indicates that this is true. The first action taken by the Board relating to the new policy-the special meeting with Attorney Lettick in executive session-occurred only two days after the Board's chairperson, Ms. Levy, became aware of the notice. Attorney Lettick drafted the first revision and sent it to Attorney Eldergill soon after that meeting, and the Board briefly addressed the policy at its next regularly scheduled meeting on May 25, 2000. While it took the Board several months to adopt the final version of the policy, the notice of intent to sue letter was one factor that led to the Board's decision.

However, it is not necessary to decide whether the filing of the notice of intent to sue may constitute the beginning of a lawsuit for purposes of determining whether the plaintiffs are entitled to attorney's fees. Here, the filing of the lawsuit itself was also a substantial factor that caused the Board to change its policy.[5]

*See Marbley,* 57 F.3d at 234; *Koster,* 903 F.2d at 135. In his June 7, 2000, letter from to Ms. Levy, Attorney Lettick indicates that the final change made to the policy-including the "objective standard"-was directly caused by "[o]ne of the claims brought by Ms. LaPointe in her federal lawsuit concerning the Public Participation Policy." While this change does not concern the public participation statement, which appeared to be most offensive to the plaintiffs, it indicates that both Attorney Lettick and the Board were directly responding to the lawsuit in revising the final policy in a significant way. This is also evidenced by the sequence of events. *See, Koppel,* 743 F.2d at 135. Also, the Board did not vote to approve the final version of the policy until after the lawsuit was filed. While Attorney Lettick drafted the second revision (the version of the policy that initially removed the public participation statement) before that time, the Board took no official action on the policy until July 27, 2000, well after the complaint had been served on Ms. Levy. Until the policy's adoption, there was no clear indication that the Board would adopt a policy that was substantially similar to the final version. While Ms. Levy informed Attorney Lettick some time between June 8 and June 19, 2000, that the

---

5. The Court notes that in cases arising under the Clean Water Act, a notice of intent to sue letter may be considered the beginning of litigation for attorney's fees purposes. *See Student Public Interest Research Group v. Monsanto Co.,* 721 F.Supp. 604, 615 (D.N.J. 1989), *overruled by Public Interest Research Group of New Jersey, Inc. v. Windall,* 51 F.3d 1179 (3d Cir.1995) (overruling only the *Monsanto* court's decision refusing to find time spent preparing notice letters compensable). However, while such notices are statutorily required under the Clean Water Act, here the plaintiffs were not necessarily required to file a notice of intent to sue. "[A] federal civil rights claim against [a] town ... [is] not barred by [a] plaintiff's failure to comply with state statute requiring town to be given notice." *Tombardi v. Quinones,* 2000 WL 852431, No. 3:98CV01921 AVC, 2000 WL 852431 *8 (D.Conn. Mar. 31, 2000) (quoting *Armao v. American Honda Motor Co.,* 917 F.Supp. 142, 144 (D.Conn.1996)); *see also Orticelli v. Powers,* 197 Conn. 9, 495 A.2d 1023, 1025–26 (1985) (finding that the notice and time limitation provisions of Conn. Gen. Stat. § 7–101(a), one of the statutes cited by the plaintiffs in their notice of intent to sue, 'have no application to the plaintiff's 42 U.S.C. § 1983 action' against the town board of education).

Board had decided "to take a more conservative approach," there is no indication that the Board held any meetings when such a decision could have been made. Thus, the sequence of events indicates that the results obtained by the plaintiffs are not of the kind "that the defendant plainly would have conferred even in the absence of a lawsuit." *Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984)

Moreover, the evidence shows that the filing of the lawsuit accelerated the Board's decision to finish the adoption process. *See id.* (remanding the case in light of the district court's failure to make findings of fact "that as a result of the suit the State took any action that it would not have taken in the absence of the suit, or that any planned action by the State was abandoned, accelerated, or slowed as a result of the suit"). The Board failed to address the policy at two separate, regularly scheduled meetings held before the suit was filed. Although the defendant explains that the delay at the June 22, 2000 meeting was caused by a clerical oversight, the fact that the Board adopted the final version of the policy without another reading, which ordinarily would have been the next step in its review of the policy, indicates that the Board did so more quickly than it would have in the absence of the suit.

Based on these facts, the filing of the complaint was a substantial factor that caused the Board to change its policy. Thus, the plaintiffs are prevailing parties within the meaning of section 1988, and thus are entitled to an award of reasonable attorney's fees and costs.

## C. Reasonable Fees

■ "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," or the loadstar figure. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *see also Weyant v. Okst,* 198 F.3d 311, 316 (2d Cir.1999). An attorney's hourly rate under § 1988 should be calculated according to those prevailing in the community for similar services by attorneys of reasonably comparable skill, experience and reputation. *See Blum v. Stenson,* 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Further, "some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed on the litigation" and thus are compensable. *Webb v. Board of Education,* 471 U.S. 234, 243, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) (quoting *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933) (referring to "obvious examples" such as "drafting initial pleadings and the work associated with the development of the theory of the case"). However, given that § 1983 does not require plaintiffs to exhaust administrative remedies, time spent in pre-litigation administrative hearings is not compensable because such hearings cannot be considered an "action or proceeding" to enforce § 1983. *Id.* at 241, 105 S.Ct. 1923. Compensation may be awarded for time spent litigating a fee claim. *See Weyant,* 198 F.3d at 316.

■ A number of other factors may affect the amount of fees awarded. In particular, "the extent of a plaintiff's success is a crucial factor in determining the amount of an award of attorney's fees under 42 U.S.C. Section 1988." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *see also Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 760 (2d Cir.1998). In addition, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley,* 461 U.S. at 433, 103

S.Ct. 1933. The following factors also may be considered:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 430 n. 3, 103 S.Ct. 1933.

■ Here, Attorney Eldergill has submitted an affidavit and time records documenting the hours she spent working on this case. She indicates that her hourly rate is $275. The defendant claims that Attorney Eldergill's hourly rate of $275 an hour is "overstated" for an attorney practicing in Manchester, Connecticut. In an affidavit, Attorney Lettick indicates that he believes that a rate of $190 to $210 an hour would be a reasonable rate for an experienced attorney in the greater Hartford area. In response, the plaintiffs point to the affidavits of Jon L. Schoenhorn and Jonathan L. Gould, two attorneys who practice in the Hartford area, as evidence that Attorney Eldergill's rate of $275 an hour is a reasonable one. Based on this evidence from attorneys of comparable skill and experience, the Court concludes that Attorney Eldergill's rate is a reasonable one. Attorney Eldergill is an experienced, very competent attorney and although this case was not particularly complex, the plaintiffs were successful in achieving the result they desired.

■ In addition, she has adequately documented the hours she spent working on this case. Included in these hours is time spent prior to the filing of the lawsuit. Some of these hours, in particular the 7.3 hours spent preparing and researching the complaint, preliminary injunction, and accompanying brief, are compensable because they clearly were spent "on the litigation." *See Webb,* 471 U.S. at 243, 105 S.Ct. 1923. However, Attorney Eldergill also has included 1.9 hours spent in telephone conferences with her client and Attorney Lettick, drafting memos to file, drafting correspondence to her client, and reviewing Attorney Lettick's proposed revision in May and early June, weeks before suit was filed. None of these activities were actually spent "on the litigation," as a complaint had not yet been filed at the time of these activities, and it was unclear at the time whether filing such a complaint would even be necessary. Accordingly, the award of attorney's fees shall be reduced by $522.50, the amount Attorney Eldergill would have been compensated for those 1.9 hours of pre-litigation work.[6] No other reduction in the amount of fees is necessary, particularly given the fact that the plaintiff's suit was successful in causing the Board to change the policy at issue. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. Thus, the plaintiffs initially are awarded attorney's fees in the amount of $3410.00, a figure which is calculated by multiplying Attorney Eldergill's hourly rate of $275.00 by 12.4, the number of hours spent on the litigation. In addition, the plaintiffs shall be awarded costs in the amount of $150.00.

---

6. In her bill, Attorney Eldergill indicated that .2 hours spent preparing correspondence to her client would not be charged. As a result, the Court has not considered this time in calculating this reduction.

For the foregoing reasons, the plaintiffs' petition for attorney's fees [Doc. # 9] is GRANTED, IN PART. The plaintiffs are hereby ordered to submit within *thirty days* of the date of this order further documentation of the hours expended litigating their request for fees and costs. *See Weyant,* 198 F.3d at 316 (2d Cir.1999) ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for § 1988 fees."). The Court will determine the reasonableness of those hours at that time.